Bonita PASCHAL, et al.,
Plaintiffs–Appellants,

v.

Sally JACKSON, Director of the Illinois
Department of Employment
Security, et al., Defendants–Appellees.

No. 90–3301.

United States Court of Appeals,
Seventh Circuit.

Argued May 10, 1991.

Decided July 9, 1991.

Jeffrey B. Gilbert, Steven Coursey, Karyn Glass, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs-appellants Bonita Paschal, Daniel Dodson, and Paul Bucasas.

Barbara C. Biddle, Katherine S. Gruenheck, Dept. of Justice, Civ. Div., Appellate Section, Washington, D.C., Jerome J. Webb, Koutsky, Boudreau & Lassen, Martin B. Lowery, Office of U.S. Atty., Crim. Div., Nancy K. Needles, Asst. U.S. Atty., Office of U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., for defendants-appellees Sally Jackson, Stella Cuthbert, Ann E. McLaughlin, Robert T. Jones and DOL.

Before BAUER, Chief Judge, and POSNER and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

In a second appeal of this case, we are asked to determine whether the State of Illinois' sovereign immunity bars an award of benefits to two classes of unemployment insurance claimants. Pursuant to 42 U.S.C. § 1983, the claimants challenged the method by which the Illinois Department of Employment Security ("IDES") administered two unemployment insurance programs: the extended benefits ("EB") program, which pays benefits during periods of sufficiently high unemployment to claimants who have exhausted their regular benefits (which last up to twenty-six weeks), and the federal supplemental compensation ("FSC") program, which paid benefits during the recession in the early 1980s to otherwise eligible unemployment insurance claimants who had exhausted their regular benefits and any extended benefits.

In the first appeal, we held that the claimants had proven at trial two due process violations. *Cosby v. Ward*, 843 F.2d 967 (7th Cir.1988). They established that IDES had failed to give claimants adequate notice of their work search responsibilities and had failed to provide claimants with notice of the issues to be determined at claims adjudicators' interviews and referees' hearings. *Id.* at 985–86. Because the district court terminated the trial after the claimants had presented their case and before the defendants had a chance to offer a case in rebuttal, we remanded the matter back to the district court for another proceeding.

There never was a second trial, however, because the parties entered into a partial settlement. We call the settlement "partial" because it affected only the EB claimants and provided only for prospective relief. Also, the relief was contingent because the EB program is available only when triggered by adverse economic conditions. The settlement provided no relief whatsoever for the FSC claimants because FSC benefits were distributed pursuant to a temporary program that since has ended. The partial settlement agreement contained one more provision as well: the parties agreed to litigate any questions concerning the remaining claims for retroactive relief. Acting on that provision, the IDES moved to dismiss the retroactive claims on the ground that the eleventh amendment to the United States Constitution deprives a federal court of jurisdiction to award retroactive relief. The district court agreed, and entered a final judgment approving the consent decree and dismissing the retroactive claims. *Cosby v. Jackson*, 741 F.Supp. 740, 743 (N.D.Ill.1990). From that judgment, the claimants brought a timely appeal.

The eleventh amendment provides that an unconsenting state is immune from lawsuits brought in federal court by its own citizens as well as by citizens of other states. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Ever since *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, it has been recognized that the eleventh amendment does not prevent a federal court from directing state officials to bring their conduct into conformity with federal law. We have that very situation here. We affirmed the judgment of the district court that certain practices of IDES were held to violate the Due Process Clause of the fourteenth amendment and the "fair hearing clause" of Title III of the Social Security Act, 42 U.S.C. § 503(a)(3). Although the eleventh amendment does not prohibit a federal court from finding liability when state officials' acts are *ultra vires*, it bars a judgment awarding retroactive damages that must come directly from the general revenues of the state. *Edelman v. Jordan*, 415 U.S. 651, 663, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). The question we are asked to resolve is whether the accrued unemployment compensation benefits sought here will have to be paid out of these types of funds.

Before we proceed, we must take some time to consider the workings of the Unemployment Trust Fund scheme. Unemployment insurance was born of the economic ills of the Great Depression. *See general-*

*ly* Bernstein and Ramel, *The Illinois Unemployment Insurance Act,* 42 Ill.Ann. Stat. XIII (Smith–Hurd 1986). From the beginning, unemployment compensation was conceived as a joint effort among the states and the federal government. The Social Security Act, 42 U.S.C. §§ 301 et seq. (1935), contained two provisions that were designed to induce the states to pass unemployment compensation laws. Title III of the Social Security Act provided that approved state unemployment compensation schemes would be financed entirely with federal funds. Title IX assigned a uniform national payroll tax on employers for contributions paid to federally approved state unemployment compensation programs. Employers who pay contributions to a state unemployment insurance program that complies with federal law are entitled to a credit against their federal unemployment tax. 26 U.S.C.A. §§ 3301–3302 (1987). The federal government has imposed certain requirements upon the states primarily to protect funds, but the states have had "wide latitude" to administer their own programs. Bernstein and Ramel, 42 Ill.Ann.Stat. at XIX.

In Illinois, as in other states, the basic operating mechanism of the unemployment compensation program is quite simple: the contributions from liable employers are collected and then distributed to eligible recipients. There are, however, more than a few intermediary steps. Pursuant to the State Unemployment Insurance Act, Ill. Rev.Stat.1989, ch. 48, ¶¶ 300–820 ("Act"), the Director of the Department of Employment Security must deposit all monies payable under the Act in a "clearing account," one of three separate accounts maintained by the Director (the other two being the benefit and special administrative accounts). Ill.Rev.Stat. ch. 48, ¶ 660. The Act provides that "[m]oneys in the clearing, benefit and special administrative accounts shall not be commingled with other State funds." *Id.* After the funds in the "clearing account" clear, the Director must immediately deposit them with the United States Secretary of the Treasury to the credit of Illinois' account in the federal unemployment trust fund. *Id.* *See also* 42

U.S.C. §§ 503(a)(4) and 1104. The Director may draw upon the funds to pay benefits up to, but not exceeding, the amount in the State's account. *Id.* The monies payable under the Act are the "sole and exclusive source for the payment of benefits." Ill. Rev.Stat. ch. 48, ¶ 790.

When the State needs funds to pay benefits, the necessary amounts are requisitioned from the federal unemployment trust fund and deposited into an unemployment fund called the "benefit account." *Id. See also* 42 U.S.C. § 1104(f); 26 U.S.C. § 3306(f). In addition to the payments to unemployed workers, the funds in the benefit account may be expended for "refunds of contributions, interest and penalties under the provisions of the Act, the payment of health insurance in accordance with [the Act], and the transfer or payment of funds to any Federal or State agency pursuant to reciprocal arrangements...." Ill.Rev.Stat. ch. 48, ¶ 660. .If unclaimed or unpaid amounts remain in the benefit account after the period for which they were requisitioned, they must be used to pay benefits in succeeding periods or redeposited in the State's account in the federal unemployment trust fund. *Id.*

Within the federal unemployment trust fund is an employment security administration account. Each fiscal year, funds are appropriated from the United States Treasury to the unemployment trust fund in an amount equal to the year's federal unemployment tax receipts. These funds then are credited to an employment security administration account. IDES can requisition money from this account to help cover administrative expenses. *Id. See also* 42 U.S.C. § 1101(c). If the federal employment security administration account has insufficient funds to defray IDES' administrative expenses, additional funds are available to IDES in its special administrative account, which is comprised of interest payments and penalties collected from employers who fail to make timely contributions. Ill.Rev.Stat. ch. 48, ¶¶ 661 and 663.

Should the federal unemployment trust cease to exist, Illinois' money would be transferred to the State Treasurer for dis-

position at the behest of the Director in accordance with the Act. Ill.Rev.Stat. ch. 48, ¶ 662. If the State's account falls short, then the governor is authorized to apply to the United States Secretary of Labor for an advance to the State's account. Any federal money received by the State or the IDES Director "shall be received and held by the State Treasurer as ex-officio custodian thereof separate and apart from all other State moneys, and such funds shall be distributed or expended ... for the proper and efficient administration of the Act." *Id.* at ¶ 663.

The EB and FSC programs operate a bit differently. States were induced to pass the EB program pursuant to the Federal–State Extended Unemployment Compensation Act of 1970, §§ 201–207 (*reprinted in* statutory and historical notes to 26 U.S.C. § 3304). Unlike regular benefits, one half of EB payouts are reimbursed by the federal government. *Id.* § 204(a)(1)(A). Within the federal unemployment trust fund is an extended unemployment compensation account. Funds from the extended unemployment compensation account can be transferred to states to cover the federal government's share. *Id.* § 204(e). As with the regular benefits program, the federal government assists the states in meeting their administrative costs. 42 U.S.C. §§ 501, 502 and 1101(c)(1)(A)(i).

In the case of FSC, the benefits are paid out of the State's benefit account. Ill.Rev. Stat. ch. 48, ¶ 660. For each state that entered into an agreement to participate in the FSC program, the federal government reimbursed or advanced all of the funds paid out. *See* Federal Supplemental Compensation Act of 1982, §§ 601–606 (*reprinted in* historical and statutory notes to 26 U.S.C. § 3304). The FSC Act also authorized funds to assist the states paying for the administrative costs of the program. *Id.* § 604(c).

▬ With this background in mind, we turn to the matters at issue in this case. The claimants argue that, because Illinois' unemployment compensation funds are held in separate accounts that may not be commingled with other State monies, pay-

ment of accrued claims from the fund is not barred by the eleventh amendment. According to this argument, the State can have no interest in immunity because it will not have to pay the relief the claimants seek. An award of EB would not affect the state treasury because half of it is reimbursed from the federal treasury and the other half from a segregated fund. As to FSC, the claimants argue that the whole award would be paid from federal funds. IDES is not responsible for any of the administrative costs associated with paying out of either fund. The claimants further submit that, because the State's collections substitute for the federal unemployment insurance tax and the federal government holds the funds until the State needs them, the State merely acts as the federal government's agent for collecting and dispersing part of the revenues necessary to operate the unemployment insurance program.

This, in essence, is the "trust fund doctrine," which holds that the eleventh amendment does not bar recovery of funds segregated from general public funds. The claimants pin their hopes on *Miller–Davis v. Illinois State Toll Highway Authority,* 567 F.2d 323 (7th Cir.1977), in their words, a "seminal" case that applied the trust fund doctrine to allow recovery of damages for alleged contract violations by the Illinois State Toll Highway Authority. We permitted such recovery after analyzing the financial organization of the Highway Authority and determining that its funds were sufficiently segregated from the general public funds in the Illinois State Treasury, so that any judgment against the fund was not a judgment against the State. *Id.* at 327.

In addition to *Miller–Davis,* the claimants point out the admittedly ample authority that recognizes that a lawsuit is not against the sovereign when the relief has no impact upon the state itself. *See, e.g., Camacho v. Bowling,* 562 F.Supp. 1012 (N.D.Ill.1983); *Kostelic v. Bernardi,* 538 F.Supp. 620, 622 (N.D.Ill.1982); *Jenkins v. Bowling,* 80 C 928 (N.D.Ill.1982), *aff'd in relevant part,* 691 F.2d 1225, 1235 (7th

Cir.1982). Among this authority is a body of case law that has allowed plaintiffs to sue a state in federal court for recovery of past unemployment claims on the ground that the state's unemployment compensation fund is sufficiently segregated from the general revenue fund. *See, e.g., Brown v. Porcher*, 660 F.2d 1001, 1007 (4th Cir.1981), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983); *Brewer v. Cantrell*, 622 F.Supp. 1320, 1323 (W.D. Va.1985), *aff'd*, 796 F.2d 472 (4th Cir.1986); *Bowen v. Hackett*, 387 F.Supp. 1212 (D.R.I. 1975); *Bigelow v. Michigan Employment Security Comm'n*, [1975–79 Transfer Binder] Unemp. Ins. Rep. (CCH) ¶ 21,520 (E.D. Mich.1978); *Black v. Caldwell*, [1975–1979 Transfer Binder] Unemp. Ins. Rep. (CCH) ¶ 21,485 (N.D.Ga.1976).

Well aware of this precedent, the district court instead cast its lot with the Tenth Circuit. In *Esparza v. Valdez*, 862 F.2d 788 (10th Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3214, 106 L.Ed.2d 565 (1989), a group of aliens who had been denied unemployment compensation sued for declaratory and injunctive relief seeking both prospective and retroactive relief for the wrongfully withheld benefits. The court of appeals indicated that it had "great difficulty" with cases that have found the segregation of funds dispositive as to the issue of whether a claim for accrued benefits is barred by the eleventh amendment. The court stated that it did not believe that a state's sovereign immunity "can be abrogated through reliance on notions of whether such relief would be paid out of a general or special revenue fund." *Id.* at 794.

We, too, have great difficulty with the view that a state's fiscal structure is dispositive of whether one can sue the state for accrued benefits. Examining the source of funds once might have proven useful in identifying the real party in interest, but such an examination is of little consequence in determining whether damages should be paid. It is a complete waste of time to engage in the niceties of determining whether a particular department of a state is "of the United States" for eleventh amendment purposes when the lawsuit is against the state and judgment will be entered against the state as an entity. We prefer an approach that disregards the source of state funds. To do otherwise forces courts to engage in a detailed audit of the defendant's finances to determine whether the defendant department or subdivision is indeed "the state." The district court hit the nail on the head: "Where Illinois gets the money to satisfy a judgment is no concern of the plaintiff or the court; what matters is that the judgment runs against the state." *Cosby*, 741 F.Supp. at 742. Moreover, it stands to reason that digging into a segregated account funded by federal money to pay retroactive claims could have an impact on the state treasury. For example, it is not altogether clear that total reimbursement from the federal government to the states is a sure thing. Title 42 § 502(a), the section of the United States Code dealing with computation of amounts paid to the states for proper administration of their unemployment compensation programs, states that the Secretary of Labor "shall not certify for payment under this section in any fiscal year a total amount in excess of the amount appropriated therefor for such fiscal year." In an era of mandatory budget reduction and rising unemployment rates, there is no guarantee that the federal government will continue to be "Johnny-on-the-spot" with ready cash in hand.

The trust fund argument also flies in the face of two United States Supreme Court decisions that have held that the segregation of funds does not abrogate the eleventh amendment. In *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946), and *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944), taxpayers sued state officials to recover taxes paid under protest. The money was segregated and held in trust pending the outcome of the litigation. In both cases, the Court held that the suits were against the state as an entity and thus barred by the states' sovereign immunity. It is an "immaterial difference," *Great Northern*, 322 U.S. at 53, 64 S.Ct. at 876, that the money

is segregated and held separate from the state's general funds when, in the end, any damage award is against the state.

As a last resort, the claimants suggest that the Supreme Court's eleventh amendment jurisprudence has changed significantly since *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1983). They contend that, "under the Court's recent analysis, whether a state is protected by sovereign immunity turns on the balance between 'the effect[s] of the relief sought.' " Appellants' Brief at 26 (quoting *Pennhurst,* 465 U.S. at 107, 104 S.Ct. at 911). Naturally, the claimants argue that, when all factors are considered, the balance of equities tips in their favor because they seek a remedy of IDES's violation of the claimants' federal rights. More pointedly, the claimants argue that if we rule against them, the EB claimants would be left without a remedy because the EB program switches "on" only during periods of sufficiently high unemployment. It has been "off" for six years.

*Pennhurst*—as we read it—recognizes a need to balance the supremacy of federal law against the constitutional immunity of the states, but does not abandon the basic reasoning of *Edelman* and *Young.* In fact, the Court in *Pennhurst* reiterated that "[u]nder the theory of *Young,* [a lawsuit challenging the constitutionality of a state official's action] would not be one against the State since the federal-law allegation would strip the state officer of his official authority. Nevertheless, retroactive relief [is] barred by the Eleventh Amendment." 465 U.S. at 103, 104 S.Ct. at 909. The Court emphasized that the recognition of the need to accommodate these competing interests is "the significance" of *Edelman: "Edelman's* distinction between prospective and retroactive relief fulfills the underlying purpose of *Ex parte Young* while at the same time preserving to an important degree the constitutional immunity of the States." *Id.* 465 U.S. at 106, 104 S.Ct. at 911. The claimants are seeking vindication of their federal rights through a retroactive damage award against the State. As we see it, this inter-

est is insufficient to override the command of the eleventh amendment.

The relief claimed by the claimants is barred by the eleventh amendment. The order of the district court approving the consent decree and dismissing the complaint is hereby

AFFIRMED.