### Daniel MILLER

v.

### TOWNE OAKS EAST APTS., et al.

#### Civ. A. No. 6:91cv681.

United States District Court,
E.D. Texas,
Tyler Division.

July 24, 1992.

Daniel Lee Miller, pro se.

Eric Dana Jensen, Tyler, Tex., for Towne Oaks East Apts., Fuller Management Co., Alan Arnold.

## MEMORANDUM OPINION
## AND ORDER

GUTHRIE, United States Magistrate Judge.

Plaintiff Daniel Miller, proceeding *pro se*, sues Defendants Towne Oaks East Apartments, Fuller Management Company and Alan Arnold for violations of 42 U.S.C. § 3604 of the Fair Housing Act. More specifically, the Plaintiff alleges racial considerations played a role in the decisions and actions of the Defendants, which included the eviction of the Plaintiff and his family. The case was transferred to the undersigned pursuant to 28 U.S.C. § 636(c).

A bench trial was conducted on July 15–16, 1992. Both parties presented witnesses and evidence. After giving the matter close consideration, the Court makes the following findings of fact and conclusions of law.

### Facts of the Case

A. *Background Facts Surrounding the Eviction*

The Plaintiff moved to Towne Oaks East Apartments, in Tyler, Texas, in 1988. His wife and teenage daughter live with him. They are Caucasian.

The problems which are the focus of this case began when the Cleavers, an African–American family, moved next door to the Plaintiff on May 20, 1989. Mrs. Cleaver had three teenage sons. The two families shared a common stairwell leading to their second story apartments.

As Mrs. Cleaver moved into the apartment, her sons made racially oriented obscenities towards the Plaintiff's daughter. They likewise made obscene statements to and about the Plaintiff. Her sons routinely engaged in such conduct over the next two years. Furthermore, they threatened the Plaintiff and his family, and called them a variety of names.

Ms. Brenda Childs testified she has managed the Towne Oaks East Apartments and lived on the premises since 1988. On May 22, 1989, the Plaintiff complained to her about the Cleavers. In response, she told him he should try to get along with the Cleavers and not judge them by their race. She testified she presumed he was a racist, even though he did not make any racially oriented comments about his neighbors. She did not talk to Mrs. Cleaver about the incident.

During the trial, numerous character witnesses testified in the Plaintiff's behalf. The witnesses were both Caucasian and African–American. They expressed the opinion that the Plaintiff was not a racist. The slight evidence to the contrary was not believable.

Ms. Childs acknowledged the Plaintiff complained to her on numerous occasions about the Cleavers during the next two years. The complaints usually concerned racial slurs made by Mrs. Cleaver's sons, but also included complaints about drug use and destructive behavior. Mrs. Childs said she investigated his complaints by talking to Mrs. Cleaver about the various incidents. Mrs. Cleaver, on the other hand, was of the opinion the Plaintiff did not like her. She alleged the Plaintiff was the source of the problems and accused him of voodoo. There was no evidence that the Plaintiff was a practitioner of voodoo.

Ms. Childs concluded there was not anything she could do about the conflict. All she had to go on was a swearing match between the two sets of families. She acknowledged, however, that she had to talk to Mrs. Cleaver about her sons breaking the glass door and scaling over the balcony to enter their mother's apartment. She told Mrs. Cleaver to provide her sons a key to the apartment. Ms. Childs also admitted police officers had occasionally been to the apartment complex about the sons and there had been arrests. She finally admitted that the Plaintiff has shown her a court record concerning an arrest of one of Mrs. Cleaver's sons. Nonetheless, she emphasized an arrest record does not mean there had been a conviction. The Plaintiff was told his court documentation was insufficient for her to take any action against the family.

There was conflicting testimony as to whether Mrs. Childs said she could not evict a black family without simultaneously

evicting a white family. Ms. Childs, it appears, was afraid she would be sued if she evicted a black family.

## B. *Events Leading up to the Eviction*

On October 29, 1990, Ms. Childs notified the Plaintiff that his lease would expire on November 30, 1990. The Plaintiff chose not to sign a new lease, but he and his family continued living in the apartment on a month to month basis.

Ms. Childs finally determined that the problems between the two families could not be solved and that she would have to evict the Millers. On April 23, 1991, she contacted Defendant Fuller Management Company about initiating eviction proceedings. She explained she had reports that the Plaintiff's cat had been allowed outside the apartment without a leash, although it is clear that many other tenants had unleashed pets on the property. She also explained she had two reports that the Plaintiff had been seen rubbing himself obscenely in an outside area visible to other residents. The testimony about lewd behavior came from two witnesses whose testimony was not credible. The Plaintiff denies the accusation about lewd behavior. On May 8, 1991, Ms. Childs was advised by the Management Company that there was insufficient documentation to warrant eviction and to send the Plaintiff a letter concerning his failure to leash his cat. She was advised further that if the Plaintiff did not comply, then Defendant Arnold (the general partner of the owner) should be notified about the plan to evict the family.

On May 30, 1991, the Plaintiff filed a complaint with the police that Mrs. Cleaver's son, Calvin, had made terroristic threats against him. More specifically, Calvin had approached the Plaintiff with a broken piece of glass and threatened "to get" him. The investigating police officer, Greg Roberts, concluded that the allegations were sufficient to be forwarded to the Smith County District Attorney for prosecution. Officer Roberts testified at the trial that the Cleaver sons were well known to the police and had criminal records.

Also around this same time, one of the Cleaver sons shoved Mrs. Miller.

On June 1, 1991, the Plaintiff talked to two tenants—Marla Thompson and her boyfriend, Jack Jones—about the Cleavers. The Plaintiff told them about his recent experiences with the Cleaver sons and indicated that one of these days the sons may push him too far and he might shoot one of them in self defense.

On June 3, 1991, Marla Thompson paid her rent to the apartment complex management. While doing so, she mentioned in passing her conversation with the Plaintiff. Ms. Childs did not discuss the conversation with the Plaintiff, but instead she documented her file with this "incident."

On June 6, 1991, Officer Roberts interviewed Ms. Childs about the Plaintiff's criminal complaint filed against Mrs. Cleaver's son, Calvin. In an incident report concerning the complaint, Ms. Childs makes the following notation: "I told the detective of some of the problems Mr. Miller had caused and that we had not had any problem with Shirley [Cleaver]."

On June 6, 1991, Ms. Childs gave thirty day eviction notices to the Millers and the Cleavers. The letter to Mrs. Cleaver stressed that arrests constituted grounds for an eviction, although the letter was limited to two of Mrs. Cleaver's sons. On June 14, 1991, a second letter was sent to Mrs. Cleaver extending the eviction notice to the entire family.

Ms. Childs initiated forcible detainer eviction proceedings with the Justice of the Peace on July 9, 1991, regarding both the Millers and the Cleavers. The proceedings against the Cleavers were dropped since they vacated their apartment. Ms. Childs dropped the initial proceedings against the Millers and filed a second set of eviction papers with the Justice of the Peace on July 29, 1991. Ms. Childs testified she refiled the papers to evict the Millers with the basis for the eviction being the completion of the lease period. The Justice of the Peace ruled in favor of the apartment complex against the Millers. The eviction is presently on appeal. The Plaintiff filed the

instant lawsuit to contest the eviction, saying it was the result of discrimination.

## C.  *Findings of Fact*

In light of the foregoing, I make further findings of fact as follows.  The Plaintiff's problems with the Cleavers were not a result of racial bias on his part.  On May 20, 1989, he and his family were the brunt of racially oriented derogatory comments by Mrs. Cleaver's sons.

On May 22, 1989, Ms. Childs concluded that the Plaintiff was a racist, even though he did not say anything to her to justify the opinion.  Her subsequent actions with respect to the Plaintiff and the Cleavers were guided, in part, by her unsubstantiated belief that Mr. Miller was a racist.  She failed to give credence to the Plaintiff's complaint about Mrs. Cleaver's sons and failed to investigate allegations the boys were engaged in criminal activities.

On June 6, 1991, Ms. Childs started eviction proceedings by sending a notice of eviction letter to the Millers.  Ms. Childs used the Marla Thompson "incident" as a pretext to evict the Millers.  Her decision to evict the Millers was based on the fact that he was white and complained about the racist treatment from his black neighbors.  Ms. Childs further believed that she could insulate herself from a discrimination suit from a black family if she evicted a white family at the same time.

### Discussion and Analysis

The Plaintiff alleges race was a consideration in leading Ms. Childs to initiate eviction proceedings against him and his family.  The Fair Housing Act, 42 U.S.C. § 3604, contains the following provisions:

[I]t shall be unlawful—

  (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

  (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

■■■ "[R]ace is an impermissible factor in an apartment rental decision ..." *Woods–Drake v. Lundy,* 667 F.2d 1198, 1202 (5th Cir.1982), *citing Smith v. Sol. D. Adler Realty Co.,* 436 F.2d 344, 349–350 (7th Cir.1970).  In order to succeed on his claims, the Plaintiff "need only prove that race was one significant factor in defendant's dealings with [him] in order to establish a violation of the Fair Housing Act." *Woods–Drake,* 667 F.2d at 1202.  *See also Sorenson v. Raymond,* 532 F.2d 496, 499 (5th Cir.1976).

■■■ The statute extends to any situation where a housing decision is based in whole or in part on racial considerations.  For example, white tenants have a bona fide claim when they are evicted by a landlord after entertaining black guests at their apartment.  *Woods–Drake, supra.*  Courts have consistently held that housing providers may be guilty of discrimination despite the fact that not all members of a protected class have been excluded.  *See Davis v. Mansards,* 597 F.Supp. 334, 345 (N.D.Ind. 1984) (defendant apartment complex found to be engaged in pattern of discrimination by discouraging the majority of black applicants despite allowing a significant number of blacks to move in); *Harper v. Hutton,* 594 F.2d 1091, 1093 (6th Cir.1979) (rental to one black applicant in ten year period does not sink discrimination claim); *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233–36 (8th Cir.1976) (if not for discriminatory application procedure, even more blacks would have applied for and resided in defendant's apartment complex).  A cognizable claim likewise exists when a landlord tolerates racist acts of one tenant against another, thereby interfering with the victim tenant's right to enforce and enjoy the lease.  *See, e.g., Bradley v. Carydale Enterprises,* 707 F.Supp. 217 (E.D.Va.1989) (construing identical provisions in the Virginia Fair Housing Law, along with federal civil rights statutes).

■ Finally, an owner of a complex is liable because of conduct on the part of a rental agent or manager. *Oliver v. Shelly,* 538 F.Supp. 600 (S.D.Tex.1982); *Dillon v. AFBIC Development Corp.,* 597 F.2d 556 (5th Cir.1979).

■ In the present case, Ms. Childs concluded, without any basis, that the Plaintiff was racially intolerant. She interpreted his allegations against the Cleavers as the complaints of a racist, and thus she gave his complaints at best superficial consideration. Even though the Cleaver sons harassed, threatened and called the Millers a variety of racially oriented names, Ms. Childs failed to take action to enable the Plaintiff and his family to peaceably enjoy their property.

Moreover, Ms. Childs attempted to insulate herself from a charge of discrimination by the Cleavers by evicting the Millers at the same time. Unbelievably, Ms. Childs testified at trial that she had not started eviction proceedings against the Cleavers on the same date as the Millers. She characterized her June 6, 1991, letter to Mrs. Cleaver only as notice that two of her sons had to move. A week later, the other two occupants were told to move. In my mind, and I so find, the Millers and the Cleavers were evicted at the same time.

The Court is not unsympathetic to the management problems of a modern day apartment complex. Not only must a manager guard against allegations of discrimination directed at the complex management, but must also ensure racial tolerance among tenants. Ms. Childs' mistake was that in trying to guard against one, she allowed the other to fester. In the final analysis, Mr. Miller was the victim of racial discrimination.

### *Relief*

■ 42 U.S.C. § 3613(c) lists the type of relief that is available to a private person in a Fair Housing suit. A court may award a plaintiff actual and punitive damages, along with injunctive relief. In the present case, the Millers are still residing in the apartment complex and desire to remain there, thus the Defendants should be enjoined from seeking to enforce the eviction of the Plaintiff from Towne Oaks East Apartments. The Defendants should additionally be enjoined from using any facts that have arisen up until this point in time to justify any new attempt to evict the Plaintiff in the future.

■ With respect to damages, the Plaintiff testified he spent at least $5,000 on attorney fees in the eviction proceedings, which are in addition to the costs of the present proceedings. The Court is of the opinion the Plaintiff should be entitled to $5,000 plus the cost of the present proceedings.

■ Punitive damages are intended to punish a wrongdoer and deter him and others from engaging in similar conduct in the future. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981). Punitive damages may be awarded where a defendant exhibits a "reckless or callous disregard for plaintiff's rights" or intentionally violates federal law. *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). In the present matter, the Court does not feel that the Defendants' conduct was egregious enough to justify an award of punitive damages. It is accordingly

ORDERED, ADJUDGED and DECREED that the Plaintiff be granted judgment that racial considerations impermissibly played a significant role in the decision to evict Plaintiff. It is further

ORDERED, ADJUDGED and DECREED that the Defendants are enjoined from seeking to enforce the eviction of the Plaintiff from Towne Oaks East Apartments. The Defendants are likewise enjoined from using any facts that have arisen up until this point in time to justify any new attempt to evict the Plaintiff in the future. It is further .

ORDERED, ADJUDGED and DECREED that the Plaintiff is awarded the sum of $5,000 as damages against the Defendants jointly and severally and is awarded court costs as he may be able to show to the Court. It is finally

ORDERED that all motions by either party not previously ruled on are hereby DENIED.