# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 15, 2011        Decided April 8, 2011

No. 10-5257

GREATER NEW ORLEANS FAIR HOUSING ACTION CENTER, ET
AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT AND ROBIN KEEGAN, IN HER OFFICIAL
CAPACITY AS EXECUTIVE DIRECTOR OF THE LOUISIANA
RECOVERY AUTHORITY,
APPELLEES

———

Consolidated with 10-5269

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-01938)

———

*A.J. Krouse* argued the cause for appellee/cross appellant
Robin Keegan. With him on the briefs were *Renee Culotta,
Suzanne M. Risey,* and *Timothy Heffernan.*

*Joseph M. Sellers*, argued the cause for appellants/cross-
appellees. With him on the briefs were *Jenny R. Yang, John*

*Payton, Debo P. Adegbile, Renika C. Moore, and Craig Goldblatt*.

Before: ROGERS and KAVANAUGH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

WILLIAMS, *Senior Circuit Judge*: The plaintiffs in this case are two fair housing organizations in New Orleans and five African-American homeowners. They claim that a program to help homeowners rebuild after hurricanes Katrina and Rita has employed a grant formula that violates the anti-discrimination provisions of the Fair Housing Act, particularly 42 U.S.C. § 3604(a). The program is administered by the Office of Community Development ("OCD") of the State of Louisiana, an entity we treat interchangeably with its predecessor, the Louisiana Recovery Authority ("LRA"). Defendant Robin Keegan is the Executive Director of the OCD. The U.S. Department of Housing and Urban Development ("HUD") is a defendant in the suit but has taken no part in this appeal and cross-appeal.

Plaintiffs sought preliminary injunctive relief, which the district court initially denied on the ground that it was barred by state sovereign immunity under the Eleventh Amendment. Plaintiffs appealed. While the appeal was pending, the district court granted the plaintiffs' later request for narrower injunctive relief. Defendant Keegan cross-appealed. Because it is plain that there are some potential remedies not running afoul of sovereign immunity, we have jurisdiction to address the substantive merits of plaintiffs' claim (regardless of

sovereign immunity's possible applicability to the injunction initially sought). Doing so, we find that the plaintiffs' showing on those merits is too weak to give them the likelihood of success required for a preliminary injunction. Accordingly, we affirm the denial of plaintiffs' initially requested injunction and reverse the grant of their follow-up injunctive claim.[1]

\* \* \*

In 2005 approximately 123,000 owner occupied homes in Louisiana were destroyed or severely damaged by hurricanes Katrina and Rita. Deferred Appendix ("D.A.") 47. Using federal funds, Louisiana created the Road Home Homeowner Assistance Program to assist Louisianans displaced by the hurricanes. The program's principal activity has been provision of grants to homeowners who wish to repair or rebuild and reoccupy their damaged homes. As of March 24, 2011, it had given 117,744 Louisiana homeowners almost $8 billion in grants for rebuilding. Office of Community Development, The Homeowner Assistance Program Weekly

---

[1] The parties on March 28, 2011, in accord with Part II.C.2 of the Circuit's Handbook of Practice, filed notice that they were engaged in serious settlement negotiations. Notice of such negotiations is of course most useful *before* the court has expended resources in drafting an opinion or opinions resolving the case. On March 29, 2011 we issued our judgment affirming the district court's judgment in No. 10-5257, reversing its judgment in No. 10-5269, vacating the injunction we had issued on September 22, 2010, and noting that that we did so for reasons to be explained "in opinions to be filed at a later date." *Greater New Orleans Fair Housing Action Center v. U. S. Dep't of Housing & Urban Development*, No. 10-5257 (D.C. Cir. March 29, 2011). These are those opinions.

4

Situation and Pipeline Report Week 247, 1 (March 29, 2011) ("Weekly Situation and Pipeline Report"), http://www.road2la.org/Docs/pipeline/week247pipeline.pdf. The program is supported by three special appropriations of Community Development Block Grants by Congress in 2005, 2006, and 2007. Pub. L. No. 109-148, 119 Stat. 2680, 2779-81 (Dec. 30, 2005); Pub. L. No. 109-234, 120 Stat. 418, 472-73 (June 15, 2006); Pub. L. No. 110-116, 121 Stat. 1295, 1343-44 (Nov. 13, 2007) ("2007 Act").

The program's grants fall into three categories. Option 1 grants are available to those Louisiana homeowners who plan to repair or rebuild their damaged homes. Homeowners receiving Option 1 grants must agree to a covenant requiring their rebuilt home to be owner-occupied for at least three years (the covenant runs with the house so that any buyer of the house is bound if the grant recipient sells the house). Options 2 and 3 relate to homeowners without plans to rebuild on their original homesites. This case concerns only grants made under Option 1.

OCD has calculated these grants by taking the lesser of the pre-Katrina value of the home and the cost-to-rebuild, subtracting the value of any FEMA or insurance proceeds received by the homeowner, and, if the homeowner carried no home insurance, applying a 30% penalty (i.e., 30% of the lower of value or cost-to-rebuild, minus any FEMA grant). D.A. 110. The resulting total is capped at $150,000. The formula has special provision for houses more than half (but not fully) destroyed and for homeowners who must raise the elevation of their homes in order to comply with new regulations. Homeowners with incomes that are no higher than 80% of the "area median income" may receive an Additional Compensation Grant ("ACG") to cover any difference between the cost-to-rebuild and the amount of their compensation and elevation grants. ACGs were initially

subject to a $50,000 limit, but that was removed before the district court heard plaintiffs' motion for a preliminary injunction. The $150,000 cap applies to any recipient's total grant, including any elevation grant or ACG. The various formulae used in awarding grants have been developed by the LRA and OCD and approved by HUD.

Plaintiffs brought suit against HUD and Keegan on behalf of all African-American homeowners in New Orleans who will have participated in the Road Home program by the first day of trial and had their grant amounts calculated on the basis of pre-storm value of their homes. The parties agreed to defer briefing on class certification until after commencement of discovery, D.A. 38-39, and there has been no ruling on class certification. Plaintiffs alleged that the Option 1 formula violates the Fair Housing Act, 42 U.S.C. §§ 3604(a), 3605(a), 3608(d), (e)(5), and the Housing and Community Development Act of 1974, 42 U.S.C. § 5304(b)(2). Their theory is that the formula's use of pre-Katrina house values as a grant ceiling had a disparate impact on African-American homeowners, who tend to live in New Orleans neighborhoods with lower property values than those in predominately white neighborhoods.

Factually, the disparate impact claim relies primarily on a 2008 study by PolicyLink, using data on the Road Home program provided by the LRA and the Louisiana Housing Finance Agency. Plaintiffs focus on a "resource gap" found by the study, which it defined as the difference between total resources available for rebuilding and the cost of rebuilding. PolicyLink calculated resources for rebuilding as including all grants under the Road Home program, *plus* money received from FEMA and the homeowner's insurance proceeds. PolicyLink, A Long Way Home: the State of Housing Recovery in Louisiana 2008 ("PolicyLink"), at 39, http://policylink.info/threeyearslater/. For rebuilding costs, it

used the same formulae that LRA used in calculating grant awards.

The study found that although African-American Option 1 grant recipients received larger average Road Home grants than white recipients, the "resource gap" was $39,082 on average for African-American grant recipients, compared with $30,863 on average for white grant recipients. PolicyLink at 42. The study suggested that much of the "resource gap" was driven by the element of the formula using home values as a ceiling on grants. Among homeowners who were paid under the prong of the formula looking to pre-Katrina home values, the average resource gap was nearly $50,000, compared to about $14,000 for homeowners who were paid under the formula's cost-to-rebuild prong. PolicyLink at 43. The study also noted that "African American households and low-income households had lower pre-storm home values than the average for closed[2] applicants rebuilding in place" and that "[l]ow-income households and African Americans had less insurance on average than any other demographic group." PolicyLink at 38. Plaintiffs presented data from the PolicyLink study and the 2000 census showing that houses in predominantly African-American neighborhoods in New Orleans have significantly lower values than houses in white neighborhoods. PolicyLink at 46-51; D.A. 163, 165.

In October 2009 the state of Louisiana (with the consent of HUD) removed the $50,000 ceiling on ACGs for low income homeowners. D.A. 236. As a result homeowners whose income was no higher than 80% of the median became eligible for total grants up to the lesser of the full cost-to-rebuild or $150,000. Because the new formula made low

---

[2] PolicyLink appears to use the term "closed" for those who had received their Road Home grants.

income homeowners eligible for grants up to the cost-to-rebuild, or $150,000, regardless of the pre-Katrina value of their homes, it effectively removed, for low income homeowners, the part of the grant formula that considered homes' pre-Katrina value. In effect, low income homeowners received the relief requested by plaintiffs. As of May 6, 2010, OCD had paid 9,301 grant recipients $326.5 million in additional ACGs. D.A. 193.

In June 2010 plaintiffs requested a temporary restraining order ("TRO") and preliminary injunction that would enjoin Keegan "from taking any action to obligate, reallocate and/or spend any funds that, as of June 2, 2010, remain available to the LRA's Road Home Homeowner Assistance program, and . . . from taking any action to submit any request to the U.S. Department of Housing and Urban Development . . . that would result in or cause further obligation, award, and/or disbursement of funds . . . ." D.A. 68. The purpose of this preliminary injunction would have been to preserve a source of funds for the additional grants that plaintiffs (and the class of homeowners they purport to represent) would be entitled to if their lawsuit were to succeed. The proposed injunction would thwart LRA's plans to use at least $100 million of available funds on a construction lending program to support loans to Road Home grant recipients who for various reasons had insufficient funds to rebuild and difficulty obtaining credit. D.A. 230-31.

The district court denied plaintiffs' motion. Although it found that the plaintiffs were likely to be able to make a prima facie showing of disparate impact, it concluded that state sovereign immunity under the Eleventh Amendment, as interpreted by *Edelman v. Jordan*, 415 U.S. 651 (1974), barred the relief. While *Edelman* finds "prospective" relief permissible under the Eleventh Amendment, it bars "retroactive" injunctive relief as an impingement on state

sovereign immunity. See *Edelman*, 415 U.S. at 677. Although the injunction sought would only hold payments in abeyance, plaintiffs sought it in aid of their claim to have grant awards recalculated for Option 1 applicants who had already been paid, and the district court ruled that a mandate of such payments would "effectively constitute an award of damages" for a past breach of a legal duty. *Greater New Orleans Fair Housing Action Center v. U. S. Dep't of Housing & Urban Development*, 723 F. Supp. 2d 1, 9 (D.D.C. 2010).

Plaintiffs appealed the denial of this first preliminary injunction motion, arguing that the district court erred in its analysis of the implications of *Edelman*. They also filed a motion in the district court for a second TRO and preliminary injunction. This alternative relief was to bar OCD from using the house value element of the existing grant formula in any future grants, relief that did not, under the district court's prior ruling, run afoul of *Edelman*'s bar on retrospective relief. Little was at stake, however. In her opposition to this second motion, defendant Keegan pointed out that as of July 29, 2010 there were only 141 African-American Option 1 grant applicants in Orleans Parish who were not eligible for an ACG and had not yet received any grants. Furthermore, of these 141 applications several did not meet program eligibility requirements, 54 had not replied to correspondence from OCD to indicate their continuing interest in the program for a substantial period of time, and over 80 had various deficiencies in their documentation. D.A. 356. Because the deadline for submitting initial Option 1 grant applications has already passed, there will not be any new applicants. 2007 Act, 121 Stat. at 1343, § 159(a).

The district court granted this second motion; because the second requested injunction would affect only the awards of future grantees, the relief sought would be permissible under *Edelman* and *Ex Parte Young*, 209 U.S. 123 (1908). *Greater*

*New Orleans Fair Housing Action Center v. U. S. Dep't of Housing & Urban Development*, 723 F. Supp. 2d 11, 13 (D.D.C. 2010). As before, it found that plaintiffs had shown a likelihood of success on the merits of their disparate impact claim, and in addition found the other elements of the conventional preliminary injunction formula tilting in plaintiffs' favor. *Id.* at 13-14.

Defendant Keegan filed a cross-appeal of the district court's ruling on the second motion for a TRO and preliminary injunction. She argues, among other things, that plaintiffs do not have standing and that the district court did not have jurisdiction to enter this preliminary injunction because jurisdiction over the matter had shifted to the court of appeals.

While the appeal and cross-appeal were pending before us, plaintiffs filed a motion for an injunction pending appeal. We granted that motion and enjoined Keegan "from committing Road Home funds to any new projects, such as the proposed construction lending program, pending disposition of this appeal." *Greater New Orleans Fair Housing Action Center v. U. S. Dep't of Housing & Urban Development*, No. 10-5257 (D.C. Cir. Sept. 22, 2010) (order granting injunction pending appeal). This ruling, in effect, gave plaintiffs temporarily the relief they sought in the first motion for a preliminary injunction.

\* \* \*

In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits. See *Munaf v. Geren*, 553 U.S. 674, 690 (2008). As we've seen, the district court resolved that issue against plaintiffs on the ground that

the relief sought would violate Louisiana's sovereign immunity. It ruled that requiring Louisiana to adjust the award of grant recipients who had already been paid under the Road Home program would be retrospective relief of the type barred by *Edelman*. The issue is in fact extremely complex, for several reasons: (1) Although the Road Home program is administered by a state agency, it is funded by the federal government; (2) Although Congress initially allowed the state agency a fairly wide discretion to deploy the funds—subject to HUD approval—in response to the Katrina and Rita disasters, the 2007 Act explicitly required them to be used "solely for the purpose of covering costs associated with otherwise uncompensated but eligible claims that were filed on or before July 31, 2007, under the Road Home program." 2007 Act, 121 Stat. at 1343, § 159(a); (3) The OCD and defendant Keegan have changed the Road Home formula over time, giving additional sums to prior recipients (leading plaintiffs to divide the grants into categories they call "initial" and "final"). And there is no precedent in our circuit applying *Edelman* to comparable facts. Other circuits have adopted greatly varying interpretations of *Edelman* where a state's discretion over the funds at issue is limited. Compare *Vaqueria Tres Monjitas Inc. v. Irizarry*, 587 F.3d 464, 478-80 (1st Cir. 2009) (holding that *Edelman* does not bar retroactive relief paid from special state trust fund), *reh'g denied Vaqueria Tres Monjitas Inc. v. Irizarry*, 600 F.3d 1 (1st Cir. 2010); *Bennett v. White*, 865 F.2d 1395, 1408 (3rd Cir. 1989) (permitting retrospective relief under *Edelman* to the extent that any funds paid by the state will be reimbursed by the United States), and *Brown v. Porcher*, 660 F.2d 1001, 1006-07 (4th Cir. 1981) (holding that *Edelman* does not bar retrospective relief when the award is not paid from a state's general revenue fund), with *Paschal v. Jackson*, 936 F.2d 940, 944 (7th Cir. 1991) (declining to inquire as to the source of state funds), and *Esparza v. Valdez*, 862 F.2d 788, 794 (10th

Cir. 1988) (rejecting a rule that would look to whether "relief would be paid out of a general or special revenue fund").

By contrast, we find the substantive merits relatively easy. But we can reach them only if permitted to do so by *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), which generally gives an absolute priority to jurisdictional questions. We conclude that *Steel Co.* presents no obstacle. We can perceive no good reason that Louisiana's sovereign immunity might preclude *all* relief. Although defendant Keegan makes several wholly implausible arguments to the effect that the second motion for a preliminary injunction is barred by the Eleventh Amendment, these arguments rest on a fundamental confusion over the significance of *Ex Parte Young*, and they read *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), as if it effectively overruled *Ex Parte Young*. At a minimum, it is clear that under *Edelman* the district court has jurisdiction to order LRA to use a different formula for future grantees. Thus, unlike the typical jurisdictional issue, the *Edelman* issue is not one that calls into question the authority of the court to hear plaintiffs' claim on the merits. So it is clear that regardless of how the Eleventh Amendment might apply to the first preliminary injunction, the district court properly exercised jurisdiction over both the case as a whole and plaintiffs' motion for a preliminary injunction, and that we may do the same.

We note for the record that, apart from situations like this where the only jurisdictional obstacle is to particular varieties of relief, there is considerable uncertainty about sequencing in the Eleventh Amendment context. The Supreme Court has found it permissible, "indeed appropriate," to decide the issue of whether a statute provides for suits against the states *before* determining whether, if it did, the Eleventh Amendment would permit such a suit. *Vermont Agency of Natural*

*Resources v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000). It reasoned that the statutory issue was "logically antecedent to the existence of the Eleventh Amendment question," *id.* (internal quotations omitted), and that the court, in resolving that issue would not "pronounce upon any issue, or upon the rights of any person, beyond the issues and persons that would be reached under the Eleventh Amendment inquiry anyway" (as it might in resolving questions such as whether the statute permitted private causes of action generally). *Id.* Thus the "combination of logical priority and virtual coincidence of scope makes it possible, and indeed appropriate, to decide the statutory issue first." *Id.* at 779-80. See also *United States ex rel. Long v. SCS Business & Technical Institute, Inc.* 173 F.3d 890, 893-98 (D.C. Cir. 1999). But at least one circuit is ready to consider merits before passing on an Eleventh Amendment issue on the grounds that state sovereign immunity, unlike ordinary subject matter jurisdiction issues such as standing, may be waived by the state and, if not raised by the state, may but need not be considered by the court *sua sponte*. *Parella v. R.I. Employees' Retirement System*, 173 F.3d 46, 53-57 (1st Cir. 1999); see also *Greenless v. Almond*, 277 F.3d 601, 607-08 (1st Cir. 2002); cf. *United States ex rel. Long*, 173 F.3d at 893-94 (noting several Supreme Court hints that the Eleventh Amendment was no more than "quasi-jurisdictional"). But see *Vermont Agency*, 529 U.S. at 779 (noting that personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication"). But because here the Eleventh Amendment is at most a barrier to some possible remedies and the district court's jurisdiction over the case as a whole is clear, we can consider the merits first, without sorting out the sequencing issue for other contexts.

13

* * *

In evaluating likelihood of success on the substantive merits, we review the district court's legal conclusions *de novo*. *Davis v. PBGC*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). Contrary to the district court, we conclude that plaintiffs' disparate impact claim lacks merit.

Section 3604(a) of the Fair Housing Act makes it unlawful "To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). We have not decided whether this permits disparate impact claims. *2922 Sherman Avenue Tenants' Association v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006). The argument that it does rests largely on the point that the language is parallel to that of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, under which a plaintiff can prevail by showing either disparate impact or disparate treatment. See *2922 Sherman Avenue Tenants' Association*, 444 F.3d at 679. Each of the eleven circuits that have resolved the matter has found the disparate impact theory applicable under the Fair Housing Act. *Id.* As the matter has not been briefed and its resolution is unnecessary to the outcome, however, we shall, as in *2922 Sherman Avenue Tenants' Association*, simply assume the availability of the disparate impact theory. We note, however, that no court has applied disparate impact theory to the formulae used administering a grant program.

Similarly, we need not decide as between the two leading tests for applying disparate impact, the four-factor balancing test of the Seventh Circuit, *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977), or the burden-shifting test of the

Second Circuit, *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935-36 (2nd Cir. 1988), *aff'd on other grounds*, 488 U.S. 15, 18 (1988). As in *2922 Sherman Avenue Tenants' Association*, the success of plaintiffs' claim doesn't turn on the details of the legal test; either approach requires proof of disproportionate impact, measured in some plausible way, 444 F.3d at 679-80, and plaintiffs have not offered such proof.

When presenting a disparate impact claim, a plaintiff must generally "demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006) (evaluating a disparate impact claim under the Equal Credit Opportunity Act); see also *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988). "The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied." *Betsey v Turtle Creek Associates*, 736 F.2d 983, 987 (4th Cir. 1984); see also *Darensburg v. Metropolitan Transportation Commission*, No. 09-15878, --- F.3d ---, 2011 WL 540592 (9th Cir. 2011) (evaluating a disparate impact claim alleging discriminatory allocation of mass transit funds). In this case, the policy—the grant formula that called for using the lesser of pre-Katrina home value and cost to repair—was applied to all applicants for Option 1 Road Home grants. The question, then, is whether the formula as a whole had a disparate impact on African-American grant applicants.

We pause to consider examples of what is precluded by a focus on the effects of the formula as a whole. In any state where African-American and white homeowners have significantly different economic profiles, it will presumably be the case that particular elements of a complex formula such as that of the Road Home program will have a disproportionate negative impact on African-Americans, an

impact potentially offset by other elements of the formula. For example, assuming that use of the pre-Katrina value of home as one element of the formula favors white homeowners on average, the PolicyLink study invoked by plaintiffs tells us that African-American homeowners received less money from insurance on average, PolicyLink at 38, so that the formula's deduction of insurance proceeds from the grant appears to favor African-Americans. Similarly, the $150,000 cap on total grants would seem to disfavor wealthier (and therefore, according to the PolicyLink study, disproportionately white) grant recipients. It seems unlikely that an agency could fashion a grant formula in this context without *some* element having a disproportionate impact on a protected group. (For the moment we defer consideration of the consequences if, as under Title VII, whites are also acceptable plaintiffs.)

For the same reason, attention to the formula's effects as a whole bars our looking at the effects of the grant formula only in Orleans Parish. If the economic profiles of racial groups differ from parish to parish in the parts of Louisiana affected by hurricanes Katrina and Rita, then a grant formula that has non-disparate racial effects for Louisiana as a whole can easily have a disparate impact on African-American residents in at least some individual parishes (not to mention smaller geographic units). To allow plaintiffs to pick a special subset of the affected localities to test for disparate impact would, just like allowing them to single out of the effects of a single formula element, expose almost any grant formula to litigation. Although plaintiffs focus much of their case on Orleans Parish, we must consider the impact on Louisiana as a whole.

Apart from these obvious limits, it is hard to see just how one may affirmatively identify a sound benchmark for assessing the disparateness of a grant formula's impact (or, to put the problem slightly differently, to say what a non-

disparate impact would look like). Plaintiffs urge us to focus on the "resource gap" facing Option 1 grant recipients, that is, the difference between the cost-to-rebuild and the "total resources" of an applicant—the latter being defined (by them and the PolicyLink study) as the grantees' total receipts from insurance, FEMA and the Road Home program. They point to the PolicyLink finding of a "resource gap" between African-American and white grant recipients of slightly over $8,000 ($39,082 on average for African-American grant recipients, compared with an average of $30,863 for white grant recipients). PolicyLink at 42.

Even if we accepted "resource gap" as the appropriate measure, which we do not, plaintiffs' evidence is problematic at best. The PolicyLink study predates the removal of the $50,000 cap on ACGs (which in turn predated the district court injunction proceeding), creating what OCD calls the Additional ACG program. That removal has had considerable impact. By May 6, 2010 (before the district court ruled on the first motion for a TRO and preliminary injunction), OCD had paid 9,301 grant recipients $326.5 million in Additional ACGs. D.A. 193. According to the most recent data, OCD has now disbursed $466,313,036.52 to 13,267 grant recipients. Weekly Situation and Pipeline Report at 5. This is more than 10% of Option 1 grants to low income recipients and represents an average Additional ACG of over $35,000. *Id.* We do not know the fraction of these grants received by African-Americans. But if African-American grant recipients are more likely to qualify as low income and are more likely to face a resource gap, as the PolicyLink study suggests, they would be eligible substantially more often, and for substantially larger average Additional ACGs, than would white recipients. Thus removal of the ceiling on ACGs casts grave doubt on plaintiffs' claim even under their "resource gap" theory.

At oral argument, plaintiffs' counsel responded to the removal of the $50,000 cap by arguing that it would have no effect among recipients altogether ineligible for ACGs, i.e., those with incomes higher than 80% of "area median income." But this sort of analytical cherry-picking seems to us no more valid than the same practice that we rejected as applied to individual elements of the formula or to geographic units.

In any event, we find the "resource gap" an inappropriate benchmark. The "resource gap" measures neither the resources a recipient receives under the Road Home program, nor a grant recipient's ability to obtain housing, nor the extent to which the Road Home program compensates a recipient for hurricane-inflicted losses. It measures only the extent to which grant receipts, FEMA receipts and insurance receipts fall short of the cost-to-rebuild a house of the size that the grant recipient owned before the hurricanes. This is a completely artificial metric. It represents an unprincipled mish-mash of considerations in tension with one another. The "resource gap" metric gestures at measuring need by calculating shortfalls from the cost of rebuilding rather than size of the total grant. But the cost-to-rebuild element rests on the size of applicant's former house, rather than assuming (as would an egalitarian concern for need) an equal cost of housing for all. And the treatment of insurance seems completely anomalous. It makes homeowners who bothered to insure their homes appear to be the recipients of some sort of government munificence, while in fact their grants have been reduced on account of their precautions (a reduction presumably made because OCD's resources were finite and because the justifications for the "collateral source" rule are absent here).

An alternative focus would be the total value of Road Home grants received, or the value of Road Home grants as a

proportion of a grantee's uncompensated losses. But on this criterion, the plaintiffs' own evidence is fatal to their claim. It indicates that African-American grant recipients on average have received *larger* total awards than did white grant recipients. PolicyLink at 38 ("African American and elderly households received higher average grants because a higher percentage of them received additional compensation grants, which were available to low-income individuals."). If anything, this discrepancy has become greater since the PolicyLink study, by virtue of removal of the $50,000 cap on ACGs.

In short, then, plaintiffs' facts are at best sketchy even on the implausible resource-gap theory, and do not begin to show a violation on the size-of-grant metric.

Alternative benchmarks are clearly conceivable. In rejecting the resource-gap theory and in tentatively applying the size-of-grant theory, we do not mean to endorse size-of-grant as necessarily suitable. Choice of a benchmark is further complicated by uncertainty whether one need consider only the impact on minority groups. As Title VII permits white employees to bring job discrimination claims, *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279-80 (1976), white grant recipients might, on the size-of-grant standard, be able to make a prima facie case of disparate impact. See also *Jordan v. Khan*, 969 F. Supp. 29, 30-31 (N.D. Ill. 1997) (permitting white plaintiff to bring racial discrimination claim under the Fair Housing Act); *Miller v. Towne Oaks East Apartments*, 797 F. Supp. 557, 561 (E.D. Tex. 1992) (same). In the face of this legal uncertainty, adoption of the size-of-grant benchmark would put OCD—and other agencies trying to develop formulae for comparable grants—in a damned-if-you-do, damned-if-you-don't quandary.

Thus the data offered by plaintiffs to show a disparate impact fall short. The numbers by no means establish that the OCD formula actually in effect at the time of the district court proceeding created results amounting to a violation even under plaintiffs' resource-gap theory, which in any event we reject. On the less implausible size-of-grant standard, the evidence flatly contradicts their claim. As a result, plaintiffs have not shown a likelihood of success on the merits. While the criteria governing grant of a preliminary injunction include other elements (the balance of harms to the parties and the effect on the public interest), see, e.g., *Davis v. PBGC*, 571 F.3d at 1291, and we review the district court's balance of factors for abuse of discretion, *id.*, there is no need to remand to the district court. When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors. See *Arkansas Dairy Cooperative Ass'n, Inc. v. U.S. Dep't of Agriculture*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253 (D.C. Cir. 2006).

We therefore affirm the district court's denial of the initially requested injunction.

* * *

We turn now to plaintiffs' second motion for a TRO and preliminary injunction. The district court granted this motion several weeks after plaintiffs' notice of appeal of its first injunction ruling. Defendants appeal this decision on several grounds, including jurisdictional ones—that plaintiffs lack standing and that their appeal of the denial of the first motion for a TRO and preliminary injunction divested the district court of jurisdiction over the matter. Under *Steel Co.* we would normally be required to address these jurisdictional questions before ruling on the substantive merits, but this case

fits well within an exception recognized by *Steel Co.* If the outcome on the merits is "foreordained" by another ruling, such that "the pretermission of the jurisdictional question [is not used] as a device for reaching a question of law that otherwise would have gone unaddressed," then a court may turn to the merits without considering the jurisdictional issue. *Steel Co.*, 523 U.S. at 98. In ruling on the first motion for a preliminary injunction, we found that plaintiffs' likelihood of success on the merits of their underlying claim was slim. Although the scope of relief requested differs, the second motion implicates the exact same disparate impact claim and thus shares the first motion's fatal defect. And, as noted above, when a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors. Our ruling on the first motion is therefore fully dispositive of the second motion. Accordingly, we reverse the district court's grant of the second motion.

* * *

As set forth in our March 29, 2011 judgment, we affirm the district court's denial of plaintiffs' first motion for a TRO and preliminary injunction and reverse the district court's grant of plaintiffs' second motion. We also, as previously ordered, vacate the injunction we had issued pending appeal. Finally, we remand the case for proceedings not inconsistent with this opinion.

Rogers, *Circuit Judge*, concurring in part and concurring in the judgment:  Although I concur in holding that plaintiffs fail to demonstrate entitlement to injunctive relief based on a likelihood of success on the merits of their disparate impact claim, I write separately to identify the narrow issue this court is required to decide in disposing of these appeals.

Plaintiffs' theory of the case is straightforward: The formula used to determine grant awards of federal funds under Option 1 of the Road Home Program[1], which bases the award on the lesser of the pre-storm value of an applicant's home and the cost to rebuild, has a discriminatory impact on African-American grantees living in historically segregated communities because generally African-Americans own homes with pre-storm values that fall below the cost to rebuild, while whites living in predominantly white communities own comparable homes with pre-storm values that exceed the cost to rebuild.  *See* Compl. ¶¶ 52-60.  Robin Keegan, then-Executive Director of the Office of Community Development for the State of Louisiana, interposed three objections to plaintiffs' claim of likelihood of success on the merits: (1) The Eleventh Amendment bars any relief; (2) The Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, does not afford a cognizable claim; and (3) Plaintiffs' evidentiary proffer does not account for the total federal funds distributed and hence fails to show that the pre-storm value calculation under Option 1 of the Road Home Program had a disparate impact on the proposed class of

---

[1] Maj. Op. at 3-4, referring to the funding of the Road Home Program by congressional appropriations of Communiity Development Block Grants in 2005, 2006, and 2007. *See generally* Title I of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 663 (codified as amended at 42 U.S.C. §§ 5301 *et seq.*).

African-American homeowners in Orleans Parish.[2]

    **1.** The Eleventh Amendment argument is based on fundamental factual and legal misunderstandings, *see* Maj. Op. at 10-11, and is effectively conceded by Keegan. Plaintiffs contend that because Keegan must use the remaining $148 million of federal funds to supplement the federal grants of existing Road Home recipients, *see* An Act Making appropriations for the Department of Defense for the fiscal year ending September 30, 2008, and for other purposes, Pub. L. No. 110-116, § 159, 121 Stat. 1295, 1343-44 (2007) ("2007 Act"), any relief would remedy an ongoing violation of federal law and have no impact on the state's treasury or budget, thereby avoiding the Eleventh Amendment's sovereign immunity bar. *See Edelman v. Jordan*, 415 U.S. 651 (1974); *Ex parte Young*, 209 U.S. 123 (1908). In response Keegan claimed that the *Ex parte Young* exception to the bar interposed by the Eleventh Amendment was inapplicable because the state, not Keegan, is the real party in interest inasmuch as the state's political or property rights and its public treasury would be adversely affected were plaintiffs to prevail. This argument is premised on Keegan's position that the recalculation of Option 1 grants sought by plaintiffs would "amount to money damages to be

---

    [2] Keegan also maintained as to the second motion for a preliminary injunction that plaintiffs lacked standing and that the district court lacked jurisdiction. *See* Maj. Op. at 9. Keegan acknowledges that three of the five named plaintiffs are homeowners in New Orleans whose grant amounts under the Road Home Program were calculated based on the pre-storm value of their homes and that they are ineligible to receive Additional Compensation Grants. *See* Compl. ¶¶ 13-17, 21; Def.-Appellee Cross-Appellant Robin Keegan Br. at 29. Class certification, by agreement of the parties, has been postponed by the district court. The court does not reach the grounds on which Keegan argues that the district court lacked jurisdiction. *See* Maj. Op. at 19-20.

paid from the State treasury," Def.-Appellee Cross-Appellant Robin Keegan Br. at 15, and that "[t]he allocation of state funds by the State of Louisiana to compensate homeowners after Hurricanes Katrina and Rita is an important sovereign state interest," *id*. at 25. Even after plaintiffs pointed to the federal source of the funds, Keegan repeated in reply that "the funds in question are state rather than federal funds." Def.-Appellee Cross-Appellant Robin Keegan Reply Br. at 23. This insistence continued during oral argument, where Keegan argued that "plaintiffs' requested relief is a retrospective claim for damages to be paid from the state treasury." Oral Arg. at 24:45-52.

Keegan has not identified any state funds that are disbursed under the Road Home Program, and Congress, in appropriating the disaster recovery Community Development Block Grant funds from which the $148 million would be drawn, mandated that "such funds serve only to supplement and not supplant any other State or Federal resources committed to the Road Home program." 2007 Act § 159(b), 121 Stat. at 1343. As plaintiffs' counsel confirmed to the district court and during oral argument, the $148 million remains in "the custody and control of the United States" and the funds "have never been disbursed to Louisiana; Louisiana has no right to use them at this point." Oral Arg. at 34:46-35:14; Clarification of the [District] Court's May 24, 2010 Order, No. 1:08-cv-1938, at 6 (D.D.C. June 6, 2010).[3] Moreover, counsel for Keegan and for plaintiffs confirmed during oral argument that any unused Road

---

[3] *See also* 2007 Act § 159(b), 121 Stat. at 1343 ("No funds shall be drawn from the [United States] Treasury under this section beyond those necessary to fulfill the exclusive purpose of this section," namely "to enable the Secretary. . . to make a grant or grants to the State of Louisiana solely for the purpose of covering costs associated with otherwise uncompensated but eligible claims that were filed on or before July 31, 2007, under the Road Home program").

Home Program funds would revert to the United States Treasury. *See* Oral Arg. at 7:45-9:00, 27:52-28:35.

As legal support for the Eleventh Amendment objection, Keegan relied on the dissenting opinion in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 78 (1996) (Stevens, J., dissenting), and *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997). As the majority notes, Keegan "implausibl[y]" reads *Coeur d'Alene* to overturn *Ex parte Young*. Maj. Op. at 11. Other than seeking an extension of the "special sovereign interest" exception addressed in *Coeur d'Alene*, Keegan cited no authority to support an Eleventh Amendment bar to plaintiffs' claims where only federal funds are involved and plaintiffs' proposed form of relief will not impose a monetary loss on the state treasury. Because the federal funds at issue remained in the United States Treasury, Keegan failed to explain how they could be considered state funds in any legal sense.[4] The Supreme Court's decision in *Edelman*, 415 U.S. at 664-67 & n.11, and its progeny, *see, e.g., Papasan v. Allain*, 478 U.S. 265, 278-81 (1986), emphasize that the Eleventh Amendment prohibits retroactive relief that imposes a "monetary loss" on the state's treasury. By failing to oppose plaintiffs' argument regarding the non-effect on the state treasury, Keegan has effectively conceded the point because "[t]he party asserting Eleventh Amendment immunity bears the burden of proving its applicability." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) (citation and internal quotation marks omitted).

---

[4] On September 22, 2010, this court granted plaintiffs' motion for a temporary injunction. Upon being advised by letter of March 28, 2011 from counsel for plaintiffs and Keegan that serious settlement negotiations were underway, *see* D.C. Cir. Handbook Section II.C.2, the court vacated the injunction on March 29, 2011.

**2.** The objection that plaintiffs have no cognizable claim under the Fair Housing Act, because, according to Keegan, the Road Home Program is a compensation grant program rather than a housing program, was a passing assertion in Keegan's brief without legal citation. A passing reference to an unsupported narrative is insufficient to present an argument to this court. *Cf., e.g., Bush v. District of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010) (citing FED. R. APP. P. 28(a)(9)(A)). Even assuming for purposes of argument that Keegan incorporated authority by referencing her memorandum opposing plaintiffs' motion for injunctive relief, the argument was confined to a footnote and a single citation involving a city's failure to prevent dumping at a neighboring site. *See* Opp'n to Pls.' Mot. for a TRO and Prelim. Inj., No. 1:08-cv-1938, Doc. No. 57, at 16 n.5 (June 14, 2010) (citing *Cox v. City of Dallas*, 430 F.3d 734, 740 (5th Cir. 2005), *cert. denied*, 547 U.S. 1130 (2006)). This court ordinarily does not address an argument presented in a footnote. *See, e.g., Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008). In any event, the cases cited by the Fifth Circuit in *Cox* are likewise not on point. *See Cox*, 430 F.3d at 740 (citing *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210 (7th Cir. 1984)). Plaintiffs' contention is different, namely that if the remaining federal funds for the Road Home Program are not available to support the ultimate remedy in their action, then thousands of plaintiffs will forever lose the opportunity to obtain grants for home repairs on a non-discriminatory basis.

**3.** The evidentiary objection is persuasive because a factual premise underlying plaintiffs' request for injunctive relief has been overtaken by events. In the district court, Keegan twice declined to dispute plaintiffs' evidentiary proffer with "data about the administration of the [Road Home] Program that would show what effect the Option 1 formula has

had," despite the district court's finding of a *prima facie* case of disproportionate impact. *See Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 723 F. Supp. 2d, 1, 6 (D.D.C. 2010). The district court noted, moreover, that Keegan has not "demonstrate[d] that plaintiffs' statistics or logic is flawed." *Id.* Nonetheless, in moving for a preliminary injunction plaintiffs have the burden to demonstrate the likelihood of success on the merits of their disparate impact claim. *See Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (citing *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008)); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

Keegan asserts on appeal that "the Road Home Program is a state-wide program" and thus "when [plaintiffs] do submit appropriate evidence, it will need to be on a state-wide level." Def.-Appellee Cross-Appellant Robin Keegan Br. at 33. The majority credits this argument. Maj. Op. at 14. Keegan made the argument only cursorily and without citation to authority, and hence it is not properly presented for this court to resolve. *See, e.g., Bush*, 595 F.3d at 388 (citing FED. R. APP. P. 28(a)(9)(A)).

Keegan does, however, present a persuasive argument with respect to the 2008 PolicyLink study[5] proffered by plaintiffs. As Keegan points out, the PolicyLink study does not consider the total current compensation package available to Option 1 applicants. Although the study notes the availability of Additional Compensation Grants ("ACGs") to low- and

---

[5] PolicyLink, *A Long Way Home: The State of Housing Recovery in Louisiana 2008* ("PolicyLink"), http://policylink.info/threeyearslater/; *see also* affidavit of June 18, 2010, by the authors explaining the methodology.

moderate-income ("LMI")[6] applicants, at the time of the study ACGs were subject to a $50,000 cap.  *See* PolicyLink at 41. Once this limitation was removed, effective January 2010, LMI applicants could receive an ACG in an amount subject only to the existing $150,000 cap for total Road Home Program grants. Keegan asserts on brief that "[s]ince minority and disabled families are more likely to be in the LMI category, the ACG grants adjust for any alleged disparity caused by the [pre-storm value] formula." Def.-Appellee Cross-Appellant Robin Keegan Br. at 34.  In other words, with regard to LMI applicants, Keegan claims the removal of the ACG cap effectively eliminated the average resource gap of nearly $50,000 identified by the PolicyLink study for all grant recipients whose awards were based on pre-storm value, which was larger for African-American applicants than their white counterparts. *See* PolicyLink at 42-43; *see also* Maj. Op. at 5-7.

During oral argument counsel for plaintiffs acknowledged that the removal of the $50,000 cap for ACGs resulted in LMI applicants "receiv[ing] the full amount [of their cost to rebuild] up to $150,000" under the Option 1 grant formula, making them "[in]eligible for any additional financial relief under the order that [plaintiffs] seek." Oral Arg. at 39:04-45. This leaves in plaintiffs' proposed class only those African-American applicants or grantees who do not qualify for ACGs due to their income levels. *See id.*  Plaintiffs claim there are 9,500 other homeowners in Orleans Parish who received initial grants based on pre-storm value but did not receive ACGs like LMI homeowners. *See* Pls.-Appellants' Br. at 22.  Keegan responds that only 19 applicants potentially fit into plaintiffs' proposed class of non-LMI African-American applicants in Orleans Parish whose grants were calculated using pre-storm

---

[6] To qualify as LMI in Orleans Parish an applicant can have a maximum income of only $29,637.

value.  *See* Def.-Appellee Cross-Appellant Robin Keegan Reply Br. at 30; *see also* Maj. Op. at 8.  Regardless of which number is correct, neither the 2000 U.S. Census data proffered by plaintiffs, showing African-Americans in New Orleans are more likely than white homeowners in New Orleans to own homes with lower values, nor the 2008 PolicyLink study, which groups all African-American homeowners in Orleans Parish together regardless of income level, allow for disparate impact analysis as to non-LMI African-American homeowners in Orleans Parish.  Plaintiffs' anecdotal evidence, including congressional testimony, does not fill the gap.  Without disaggregated data, the showing regarding African-American applicants who are ineligible for ACGs is "too weak to give [plaintiffs] the likelihood of success required for a preliminary injunction."  Maj. Op. at 3.

The court, as a result, need not address the other three preliminary injunction factors.  *See Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006); Maj. Op. at 19.  It bears noting, however, that the majority takes a strange turn in disposing of these appeals.  In reaching Keegan's evidentiary objection, the majority meanders into disparate impact theory – without citation to authority, *e.g.*, Maj. Op. at 14-15, 17 – and into benchmark suppositions not briefed by the parties much less argued in the district court, *id.* at 17-18, and set up only to be rejected without record evidence on either side of the new constructs while ignoring support for plaintiffs' evidentiary proffer, *id.* at 19.  The majority's statewide analysis requirement, *id.* at 14-15, suffers from similar flaws and, as noted, that argument by Keegan is not properly before the court.  Along the way, the majority even speculates that white recipients might have disparate impact claims under a different, size-of-grant benchmark.  *Id.* at 18.  One might well wonder what purpose these meanderings have other than to posit hurdles for future disparate impact claims.  Whatever their

purpose, the comments by the majority are unnecessary to the resolution of these appeals. Because these issues were not argued by the parties in their briefs (Keegan's passing assertions bare of authority fail to conform to FED. R. APP. P. 28(a)(9)(A)), and the appeals are based on a pre-discovery record inasmuch as Keegan refused to present statistical data on the Road Home Program to challenge plaintiffs' evidentiary proffer in the district court, ruminations regarding disparate impact analysis and alternative statistical benchmarks are properly left for another day.